## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## PECOS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **No. PE:21-CR-00680-DC-DF-1** |
| | § | **No. PE:22-CV-00047-DC-DF** |
| **RAMIRO ESTEBAN GRANADOS-** | § | |
| **DOMINGUEZ** | § | |

## REPORT AND RECOMMENDATION OF THE U.S. MAGISTRATE JUDGE

TO THE HONORABLE DAVID COUNTS, U.S. DISTRICT JUDGE:

BEFORE THE COURT is Defendant Ramiro Esteban Granados-Dominguez's ("Defendant") Motion to Vacate Under 28 U.S.C. § 2255 (hereafter, "Motion to Vacate"). (Doc. 39). This matter is before the undersigned United States Magistrate Judge through a standing order of referral pursuant to 28 U.S.C. § 636 and Appendix C of the Local Court Rules for the Assignment of Duties to United States Magistrate Judges. After due consideration, the undersigned **RECOMMENDS** that Defendant's Motion to Vacate be **DENIED**. (Doc. 39).

### I. BACKGROUND

On July 8, 2021, Defendant was indicted on one count of violating 8 U.S.C. § 1326(a) and (b)(2) of the Immigration and Nationality Act of 1952 ("INA").[1] On August 6, 2021, Defendant pleaded guilty without a plea agreement.[2] Defendant's retained counsel, Felix Valenzuela, filed a sentencing memorandum along with a Motion for Downward Departure or Variance prior to sentencing.[3] On November 23, 2021, Defendant was sentenced to 57 months of imprisonment with a 3-year period of supervised release.[4] Final judgment was entered on December 7, 2021.[5] Defendant

---

1. (Doc. 10).
2. (Doc. 19).
3. (Docs. 24, 25).
4. (Doc. 26).
5. (Doc. 27).

filed a notice of appeal to this Court's sentence on December 14, 2021.[6] The United States Court of Appeals for the Fifth Circuit affirmed this Court's judgment in September 2022.[7]

Defendant filed *pro se* his Motion to Vacate on December 20, 2022.[8] The Government filed a Response on February 18, 2023.[9] Defendant has not filed any Reply. This case is now ripe for disposition.

## II. LEGAL STANDARD

Section 2255 permits an inmate serving a post-conviction sentence "to move the court which imposed the sentence to vacate, set aside or correct the sentence."[10] Relief under § 2255 is limited to those "transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice."[11] A motion may be made under § 2255 on only four grounds: (1) "the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "the court was without jurisdiction to impose such sentence"; (3) "the sentence was in excess of the maximum authorized by law"; or (4) the sentence is "otherwise subject to collateral attack."[12] Thus, "[i]n the absence of constitutional or jurisdictional defects, a federal prisoner may invoke § 2255 only if the error constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"[13]

## III. DISCUSSION

Defendant states two grounds for his § 2255 claim. The first ground concerns ineffective assistance of counsel. Specifically, Defendant believes his counsel, Mr. Valenzuela, was ineffective because he failed to challenge his indictment as violating the Equal Protection Clause of the Fifth

---

6. (Doc. 29).
7. (Doc. 33).
8. (Doc. 39).
9. (Doc. 49).
10. 28 U.S.C. § 2255(a).
11. *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996).
12. *United States v. Faubion*, 19 F.3d 226, 232 (5th Cir. 1994) (citing 28 U.S.C. § 2255(a)).
13. *Pillault v. United States*, 371 F. Supp. 3d 325, 330 (N.D. Miss. 2019) (quoting *United States v. Addonizio*, 442 U.S. 178, 185 (1979)).

Amendment to the United States Constitution. Defendant's second ground relates to his conviction—he himself claims that the law pursuant to which he was convicted is discriminatory and violates his equal protection rights. For these errors, Defendant requests the Court dismiss his indictment and conviction.[14]

## A.     Necessity of an Evidentiary Hearing

The trial court must first conduct a preliminary review of the § 2255 motion, and "[i]f it plainly appears from the motion, any attached exhibits, and the record of the prior proceeding that the moving party is not entitled to relief, the judge must dismiss the motion."[15] After the court reviews the Government's response and any transcripts of prior proceedings, the court must decide whether an evidentiary hearing is warranted.[16] An evidentiary hearing may be warranted if the petitioner "produce[s] independent indicia of the likely merit of his allegations."[17] Thus, a § 2255 motion necessitates an evidentiary hearing "unless either (1) the movant's claims are clearly frivolous or based upon unsupported generalizations, or (2) the movant would not be entitled to relief as a matter of law, even if his factual assertions were true."[18]

As will be discussed below, the undersigned finds that Defendant's Motion to Vacate can be decided entirely on the pleadings and evidence in the record. Although Defendant argues that his "evidence" indicates that § 1326 is unconstitutional, as noted in the following analysis, Defendant's arguments are without merit and no further evidence is needed. Defendant's proposed armada of professors[19] will conceivably do little to inform the Court of the statute's legislative history beyond its own research capabilities. Further, as outlined below, Defendant's proffered testimony concerns

---

14. (Doc. 39 at 4, 5, 12).
15. *Norman v. United States*, 376 F. Supp. 3d 700, 704 (N.D. Miss. 2019) (citing Rule 8, RULES GOVERNING SECTION 2255 PROCEEDINGS) (alteration in original).
16. Rule 8, RULES GOVERNING SECTION 2255 PROCEEDINGS.
17. *United States v. Bogomol*, No. 18-11486, -- F. App'x -- , 2021 WL 3620444, at *3 (5th Cir. Aug. 13, 2021) (original alterations omitted) (citing *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006)).
18. *United States v. Harrison*, 910 F.3d 824, 826–27 (5th Cir. 2018) (citing *United States v. Guerra*, 588 F.2d 519, 521 (5th Cir. 1979))
19. (*See* Doc. 39 at 36).

the UAA of 1929, which is not the statute at hand or with which he was charged.[20] An evidentiary

hearing is therefore not necessary.[21] Accordingly, the undersigned **RECOMMENDS** that the Court

deny any opportunity for an evidentiary hearing on Defendant's Motion to Vacate.

## B.        Ground One: Ineffective Assistance of Counsel

Defendant's first ground for relief is that he received ineffective assistance of counsel during

the trial court proceedings. The undersigned disagrees.

To prevail on an ineffective assistance of counsel claim, the petitioner under the familiar

*Strickland v. Washington* test "must demonstrate that: (1) counsel's performance was deficient; and

(2) the deficient performance prejudiced the defense."[22] As to deficiency, counsel needed to have

"made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant

by the Sixth Amendment."[23] The defendant must show that, "in light of the circumstances as they

appeared at the time of the conduct, 'counsel's representation fell below an objective standard of

reasonableness' as measured by 'prevailing professional norms'" in order to satisfy the deficiency

prong.[24] There is a "strong presumption that counsel's representation was within the 'wide range' of

reasonable professional assistance.'"[25]

Regarding prejudice, counsel's errors must have been "so serious as to deprive the defendant

of a fair trial, a trial whose result is reliable."[26] This prong is satisfied by a showing that there is a

---

20. (*Id.* at 37 ("Both experts have written extensively on the [UAA] and can testify about the historical events surrounding its passage.")).

21. *See United States v. Tate*, Nos. H-15-631-1, H-18-4234, 2021 WL 2834675, at *8 (S.D. Tex. July 7, 2021); *see also Elliott v. United States*, Nos. 4:16cv621, 2019 WL 3890161, at *7–8 (E.D. Tex. June 26, 2019), *report and recommendation adopted*, Nos. 4:16-CV-621, 4:14-CR11(01), 2019 WL 3858662 (E.D. Tex. Aug. 16, 2019); *United States v. Nelson*, Nos. Civ.A. 89-20081-01, 97-3180-EEO, 1997 WL 614344, at *11–12 (D. Kan. Sept. 22, 1997); *United States v. Chavez*, Nos. CIV 04-1430 BB/KBM, CR 03-2035 BB, 2005 WL 8163945, at *1 (D.N.M. May 10, 2005).

22. *United States v. Guzman*, No. 19-10783, 2021 WL 4610124, at *2 (5th Cir. Oct. 6, 2021) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *United States v. Scott*, 11 F.4th 364, 368 (5th Cir. 2021) (citing *Garza v. Idaho*, 139 S. Ct. 738, 744 (2019)); *Lee v. United States*, 137 S. Ct. 1958, 1964 (2017) (citing *Strickland*, 466 U.S. at 688).

23. *Jones v. United States*, 14 F. Supp. 3d 811, 815 (W.D. Tex. 2014) (quoting *Strickland*, 466 U.S. at 687).

24. *King v. Davis*, 883 F.3d 577, 586 (5th Cir. 2018) (quoting *Rhoades v. Davis*, 852 F.3d 422, 431 (5th Cir. 2017)).

25. *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 104 (2011)).

26. *United States v. Wines*, 691 F.3d 599, 606 (5th Cir. 2012) (citing *Strickland*, 466 U.S. at 687).

"reasonable probability . . . sufficient to undermine confidence in the outcome" of a criminal trial

that, "but for counsel's unprofessional errors, the result of the proceeding would have been

different."[27] Such probability requires a "substantial" as opposed to a "conceivable" likelihood of

another result.[28]

     Defendant first asserts that Mr. Valenzuela was ineffective during the trial court proceedings

because he allegedly failed to challenge the indictment as violative of his equal protection rights.

Defendant claims his counsel's assistance was ineffective because he "would not have plead[ed]

guilty to the charge had he been adequately informed of the [equal protection] law by his lawyer."[29]

The Government responds that Mr. Valenzuela did notify Defendant of this issue and advised him on

its merits, but Defendant nevertheless pleaded guilty.

     Some background is in order. Attached to the Government's response is an affidavit by Mr.

Valenzuela. In it, Mr. Valenzuela exclaims that on August 8, 2021, after Defendant's guilty plea but

prior to his sentencing, Defendant contacted him about *United States v. Carrillo-Lopez*, a case from

the District Court for the District of Nevada.[30] There, the court granted a defendant's motion to

dismiss his indictment, holding that the charged statute, 8 U.S.C. § 1326, violated the Fifth

Amendment's equal protection guarantee.[31] Mr. Valenzuela spoke with Defendant three days later

"and explained the difference between mandatory and persuasive authority." In particular, Mr.

Valenzuela "explained that similar arguments [to those in *Carrillo-Lopez*] were raised in the Fifth

Circuit[] with no success." Mr. Valenzuela states that he thereafter provided copies of a Southern

District of Texas case where the court denied the defendant's motion, having been made on the same

grounds.[32] That court observed that "all but one court has declined to dismiss [a § 1326 indictment]

---

27. *United States v. Lagos*, 25 F.4th 329, 335–36 (5th Cir. 2022) (internal citation omitted).
28. *Wines*, 691 F.3d at 604.
29. (Doc. 39 at 5).
30. (Doc. 49-1 at 2–3).
31. *See* 555 F. Supp. 3d 996, 1027 (D. Nev. 2021) (Du, C.J.).
32. (Doc. 49-1 at 3–4).

on th[e] basis" of racial discrimination. Further, it noted that other Fifth Circuit district courts "have rejected these arguments."[33]

Mr. Valenzuela also asserts that he and Defendant discussed the likelihood of success on a motion to dismiss in this Court, and that he "spent significant time answering [Defendant's] questions." Given that Defendant had already pleaded guilty, Mr. Valenzuela also informed Defendant that they would need to withdraw his plea. The pair ended up deciding to prepare for the then-upcoming sentencing instead of withdrawing the plea or moving to dismiss the indictment.[34]

The undersigned holds that Defendant's assertions are meritless. Under the Rules Governing Section 2255 Proceedings, a defendant's motion must "specify all the grounds for relief available to the moving party" as well as "state the facts supporting each ground."[35] "[M]ere conclusory allegations do not raise a constitutional issue in a habeas proceeding."[36] A movant claiming ineffective assistance of counsel has the burden of "identifying some facts that raise the spectre of constitutional error."[37] Thus, Defendant must allege facts supporting both deficiency and prejudice in Mr. Valenzuela's actions.

Here, Defendant's assertions of ignorance in the instant motion are plainly contradicted by the facts before the Court. According to Mr. Valenzuela, he and Defendant discussed the viability of a motion to dismiss indictment, as well as the fact that only an evident minority of cases have approved of similar arguments. Defendant decided to continue to proceed to sentencing without a motion. Yet Defendant claims Mr. Valenzuela should have moved to dismiss the indictment on the very grounds that a majority of courts outside of and every court within the Fifth Circuit have

---

33. *See United States v. Hernandez-Lopez*, 583 F. Supp. 3d 815, 818 (S.D. Tex. 2022).
34. (Doc. 49-1 at 4).
35. Rule 2(b), RULES GOVERNING SECTION 2255 PROCEEDINGS.
36. *Smallwood v. Scott*, 73 F.3d 1343, 1351 (5th Cir. 1996) (citation omitted).
37. *United States v. Woods*, 870 F.2d 285, 288 (5th Cir. 1989).

rejected.[38] Defendant, through his purportedly several conversations with Mr. Valenzuela, appears to have been apprised of the constitutionality of § 1326 and the merely distant possibility of success.[39] His argument to the contrary—that Mr. Valenzuela failed to inform him or move to dismiss the indictment on those grounds—therefore fails. Defendant has not met his burden of demonstrating that the representation by Mr. Valenzuela, whose actions in informing Defendant are presumed reasonable, was deficient.

Even if Mr. Valenzuela's conduct were deficient, the undersigned would still hold that Defendant has not met his burden of showing prejudice. Defendant only exclaims that he would not have pleaded guilty to the charged count. In such a case, the proceedings of course would not have concluded at the plea stage. However, Defendant does not indicate anywhere that going to trial or otherwise refusing to take a plea would have resulted in a lesser sentence or that he may have been acquitted of the charges before him. Indeed, by pleading guilty and obviating the need for a trial, Defendant received a reduction in his offense level of three.[40] Further, if Mr. Valenzuela had moved to dismiss the indictment as Defendant now regrets he did not do, there is no reason to believe that, as will be explained below, this Court would have broken way with its sister courts in the Fifth Circuit and aligned itself with *Carrillo-Lopez*. In other words, Defendant's attempt to retrospectively inject foresight into his attorney's mind is without foundation. He has not shown that, but for Mr.

---

38. *Carrillo-Lopez*, the only court to date to have found § 1326 unconstitutional on equal protection grounds, has itself been distinguished by another court in the District of Nevada. *See United States v. Salas-Silva*, No. 3:20-cr-00054-RCJ-CLB, 2022 WL 2119098, at *3 (D. Nev. June 13, 2022) (Jones, J.) (following "the reasoning of the majority courts" in holding that the evidence on which *Carrillo-Lopez* relied was "insufficient to find that Congress acted out of racial animus"). The only court to approve of *Carrillo-Lopez* is the *Carrillo-Lopez* court itself. *See United States v. Vasquez-Ortiz*, No. 3:21-cr-00023-MMD-WGC, 2021 U.S. Dist. LEXIS 181988 (D. Nev. Sept. 23, 2021) (Du, C.J.). Thus, the objective appeal of *Carrillo-Lopez* is further diminished.

39. While Defendant does not cite the case directly, some language in the Motion to Vacate resembles that of the *Carrillo-Lopez* opinion. (*Compare* Doc. 39 at 34 ("Though no publicly available statistics exist concerning the national origin of persons prosecuted for § 1326 today . . . .") *with Carrillo-Lopez*, 555 F. Supp. 3d 996, 1005 (D. Nev. 2021) (Du, C.J.) ("While no publicly available data exists as to the national origin of those prosecuted under [§] 1326 . . . .")). The undersigned recognizes that, while perhaps a clever move to avoid drawing the Court's attention to the fact that *Carrillo-Lopez* has not been approved by any other court since its release, there is a negligible likelihood of success here.

40. (Doc. 23 at 4–5).

Valenzuela's alleged error, he would have achieved the result he is looking for here—a finding of unconstitutionality. Defendant has therefore not met his burden of proving ineffective assistance of counsel.

Defendant has demonstrated neither deficient performance nor prejudice. Accordingly, the undersigned **RECOMMENDS** that the Motion to Vacate be **DENIED** as to Defendant's first ground for relief. (Doc. 39).

## C.     Ground Two: Unconstitutional Statute

Defendant alternatively himself argues that § 1326 is unconstitutional as violative of the Fifth Amendment's equal protection guarantee. Defendant presents this argument under *Arlington Heights v. Metropolitan Housing Development Corp.*,[41] the rationale being that the law is admittedly facially neutral but was enacted with a discriminatory purpose and disparately impacts a certain ethnic or racial group.[42]

The Government contests this conclusion for two primary reasons. First, the Government advocates for the more deferential rational basis review, which § 1326 purportedly satisfies. Second, even if the heightened, strict scrutiny-esque *Arlington Heights* standard is applied, the Government maintains that § 1326 still remains constitutional.

To resolve this case, the Court will need to determine the appropriate scrutiny standard for Defendant's claim. Beginning with the United States Constitution, the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."[43] The Supreme Court of the United States has interpreted the Fifth Amendment to "contain[] an equal

---

41. 429 U.S. 252 (1977).
42. (Doc. 39 at 17). Defendant appears to confuse this Court—and its appellate Fifth Circuit—with that of the United States Court of Appeals for the Ninth Circuit. (*See id.* at 19 (citing Ninth Circuit cases and referring to them as released by "this Court")). This likely is due to the fact that he is imprisoned in California. (*Id.* at 15). Although this authority is not binding, the undersigned will construe his pleadings liberally and draw as much persuasive support from his citations as reasonably possible.
43. U.S. Const. amend. V.

protection component prohibiting the United States from invidiously discriminating between individuals or groups."[44]

There are three situations in which equal protection claims may be asserted. The usual such challenge involves a statute that "discriminates on its face against certain protected groups or trenches upon certain fundamental interests." Another instance is where a statute, fair on its face, is unlawfully administered by its enforcers, thereby "resulting in unequal application to those who are entitled to be treated alike."[45] The last is where a law is "facially neutral but ha[s] racially disproportionate effects."[46] Defendant seeks recovery only under the latter situation.[47]

The text of the statute confirms that it cannot be challenged as facially discriminatory. Section 1326 "makes it a crime for any alien who 'has been denied admission, excluded, deported, removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding' to 'thereafter enter[], attempt[] to enter, or [b]e at any time found in, the United States' without appropriate authorization." On its face, § 1326 is neutral, as all previously removed aliens who illegally re-enter the United States are subject to prosecution despite their race or nationality.[48]

The missing piece of the constitutional puzzle is thus which level of scrutiny is appropriate to evaluate Defendant's claim. The district courts encountering this issue have wavered in applying one of either *Arlington Heights* or rational basis.[49] The Fifth Circuit recently supplied the proper form of analysis for this type of constitutional challenge regarding § 1326, and expressly declined to resolve which standard of review applies.[50] The sole guidance from a binding source is the Supreme Court's admonition that strict scrutiny under *Arlington Heights* only applies where there is "evidence that the

---

44. *Washington v. Davis*, 426 U.S. 229, 239 (1976).
45. *Wilson v. Birnberg*, 667 F.3d 591, 599, 599 (5th Cir. 2012) (alterations and quotation marks omitted).
46. *Harness v. Watson*, 47 F.4th 296, 303–04 (5th Cir. 2022) (quotations omitted).
47. (Doc. 39 at 17).
48. *United States v. Barcenas-Rumualdo*, 53 F.4th 859, 864, 864 (5th Cir. 2022) (quoting 8 U.S.C. § 1326) (alterations in original).
49. *United States v. Hernandez-Lopez*, 583 F. Supp. 3d 815, 818 (S.D. Tex. 2022).
50. *Barcenas-Rumualdo*, 53 F.4th at 865.

legislature as a whole was imbued with racial motives."[51] Though the undersigned does not below find any Congress-wide racial motivation behind the enactment of the neutral § 1326 and INA, rational basis should apply. Regardless, the undersigned concludes that § 1326 appears constitutional under both standards. Accordingly, this question need not be definitively resolved at this time.

### 1. Rational Basis Review

The undersigned begins with rational basis review. A statute satisfies rational basis review if "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."[52] The Fifth Circuit has observed that a "court need find only a conceivable rational basis for the official action" to uphold the Government's classification.[53]

In this case, Defendant's Motion to Vacate does not argue that § 1326 is unsupported by a sufficient rational basis. Instead, his analysis relies solely on the application of *Arlington Heights*. The Government, on the other hand, argues for the application of the rational basis standard, only addressing *Arlington Heights* in the alternative. There is an obvious legitimate governmental purpose in criminalizing the illegal presence of unlawful aliens, particularly those who have already been removed from the country.[54] Defendant's failure to argue for rational basis in his Motion to Vacate or file a Reply in support thereof signify that he has not met his burden of showing that there is no rational basis between this purpose and any disparity of treatment. Therefore, he has failed to demonstrate that § 1326 does not satisfy the lesser rational basis standard.

### 2. *Arlington Heights*

Defendant's assertion for relief stems primarily from the *Arlington Heights* case. The Government contends that § 1326 is constitutional even through that lens. The undersigned agrees.

---

51. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021).
52. *Barcenas-Rumualdo*, 53 F.4th at 865 (citing *Heller v. Doe*, 509 U.S. 312, 320 (1993)) (quotation marks omitted).
53. *Id.* (citing *Hines v. Quillivan*, 983 F.3d 266, 273 (5th Cir. 2020)) (quotation marks omitted).
54. *Solorzano-Gonzalez v. United States*, Nos. 1:22-cv-34, 1:19-999-1, 2022 WL 1527535, at *4 (S.D. Tex. Apr. 18, 2022).

The Supreme Court has observed that a facially neutral statute can violate one's equal protection rights "if it has a racially disproportionate impact." Discriminatory purpose is not alone dispositive, however—invidious discriminatory purpose *and* disparate impact are both factors in this fact-intensive calculus.[55] Indeed, in the context of a facially neutral statute, a defendant must provide proof (1) "that the statute was enacted for a discriminatory purpose or intent" and also (2) "that it has a disparate impact." If the defendant satisfies this burden, the burden shifts to the Government to demonstrate that "it would have enacted the law without the discriminatory purpose."[56]

### i.      Discriminatory Purpose or Intent

Under the first step of *Arlington Heights*, Defendant must "prove by an evidentiary preponderance that racial discrimination was a substantial or motivating factor in enacting the challenged provision." *Arlington Heights* outlines five factors for consideration in making this determination: "(1) the historical background of the decision[;] (2) the specific sequence of events leading up to the decision[;] (3) departures from the normal procedural sequence[;] (4) substantive departures[;] and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." This analysis is to be performed under the presumption that Congress acted in good faith.[57]

As a preliminary matter, an undeniably significant portion of Defendant's Motion to Vacate[58] concerns the history and debates behind the enactment of the Undesirable Aliens Act of 1929 ("UAA").[59] The Government correctly notes, however, that the UAA was not the basis for Defendant's prosecution.[60] The Fifth Circuit has advised that courts are to utilize the "'most recent

---

55. *Arlington Heights*, 429 U.S. at 264–66, 266.
56. *Barcenas-Rumualdo*, 53 F.4th at 864 (citing *Arlington Heights*, 429 U.S. at 265–66).
57. *Id.* at 866, 866 (quotation marks omitted).
58. For the purposes of this analysis, "Motion to Vacate" includes Defendant's affixed memorandum of law in support. (*See* Doc. 39 at 15–38).
59. (*See id.* at 16). Defendant attempts to characterize the UAA as the "original version of § 1326." (*Id.*). As the Government makes clear, however, § 1326 stood as a consolidation of multiple post-deportation reentry statutes which had imposed differing penalties upon different groups of individuals. *See* S. Rep. No. 81-1515, at 656 (1950).
60. (Doc. 49 at 3).

enactment of the challenged provision[]' in determining its constitutionality."[61] Section 1326 was enacted as part of the INA in 1952, not with the UAA in 1929. The INA has since undergone several reenactments and amendments over 70-plus years.[62] Thus, the INA is the proper point of reference, as troubling and deplorable as the UAA's history may be. The analysis of Defendant's proffered history will thus be narrowed to § 1326 and the INA only.[63]

### a.      Historical Background

Addressing Defendant's evidence of racism, the undersigned reiterates that all such evidence concerns the UAA of 1929. While perhaps somewhat relevant, the UAA was enacted against the backdrop of the 70th Congress. The INA of 1952, the properly considered statute, on the other hand, was enacted twenty-three years later during the 82nd Congress. Thus, any of Defendant's proffered historical background as to the UAA of 1929 "is remote in time" to the INA; accordingly, "its probative value as to the motivations of the 82nd Congress is limited."[64]

To consider Defendant's evidence of the historical underpinnings of the UAA's enactment in evaluating his claim against the INA would be to transpose interwar politics and fearmongering with Cold War-era immigration considerations. Put simply, it would be improper. But even if Defendant's evidence of animus in the UAA's enactment were considered, it would be insufficient to find a discriminatory purpose behind § 1326.

---

61. *Barcenas-Rumualdo*, 53 F.4th at 866 (quoting *Harness*, 47 F.4th at 306).
62. *Id.* Defendant acknowledges that the INA is a later iteration of the UAA. (Doc. 39 at 32). This "sins of the father" contention therefore fails. *See Harness*, 47 F.4th at 306.
63. Defendant points to two decisions of the Supreme Court for the proposition that "later reenactments do not cleanse [a] law of its original taint." (Doc. 39 at 15–16, 32–33). Neither case, *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), or *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020), supports this rule. *See Barcenas-Rumualdo*, 53 F.4th at 866 n.22 (rejecting defendant's argument for the same); *see also United States v. Romo-Martinez*, No. SA-21-CR-00263-OLG, 2022 WL 16825190, at *6 (W.D. Tex. Nov. 8, 2022) (observing that neither of the decisions involved equal protection challenges).
64. *See United States v. Wence*, No. 3:20-cr-0027, 2021 WL 2463567, at *6 (D.V.I. June 16, 2021); *see also United States v. Morales-Roblero*, No. 3:19-mj-24442-AHG, 2020 WL 5517594, at *10 (S.D. Cal. Sept. 14, 2020).

Defendant's cited historical background expressly refers to the 1920s, a time during which xenophobia and racism indubitably ran rampant. As other district courts have recognized, the 1920s backdrop and racial sentiments differed drastically from those present during the early 1950s.[65]

Defendant also cites the 1920s-era testimony of Dr. Harry H. Laughlin, who purportedly directed a eugenics-based sterilization program in the United States and testified before Congress throughout the decade. Even if Dr. Laughlin's abhorrent and now-debunked ideology were contemporaneous with the 1952 INA, his testimony would be improper to consider. Under *Arlington Heights*, determining the motivations of Congress requires insight into how the politicians who *voted in favor* of the supposedly discriminatory legislation believed.[66] Doctors and even the President of the United States are thus excluded.[67] Dr. Laughlin, like President Truman, was not a member of Congress who voted in favor of either act. Accordingly, Dr. Laughlin's then-outdated testimony is not informative of Congress's own intent. With no other historical evidence cited, the background of § 1326 cannot be said to be tinged with racism. This factor therefore does not benefit Defendant.

### b.    Specific Sequences of Events

As to the specific sequences of events, Defendant again cites congressmen and federal agencies from the 1920s. All of these events are precursors to the UAA of 1929, not the INA of 1952. As noted above, in the twenty-three-year interim between the two acts, many a change in the geopolitical and cultural landscape was had. There is nothing here about the sequence of events leading up to the INA's passage "that would spark suspicion."[68] This factor therefore does not benefit Defendant.

### c.    Procedural or Substantive Departures

---

65. *See, e.g.*, *Hernandez-Lopez*, 583 F. Supp. 3d at 820.
66. *United States v. Muñoz-De La O*, 586 F. Supp. 3d 1032, 1048 (E.D. Wash. Feb. 18, 2022) (stating that contemporary but non-congressional statements gave "no direct insight into the motivations of the 1952 Congress that passed the law").
67. *See Salas-Silva*, 2022 WL 21190098, at *3.
68. *Arlington Heights*, 429 U.S. at 269.

Defendant contends that "several irregularities and illogical conclusions" persisted in the passage of § 1326, again erroneously citing the UAA. The undersigned is not convinced.

"Departures from the normal procedural sequence" or "[s]ubstantive departures" from "the factors usually considered important by the decision maker" "might afford evidence that improper purposes are playing a role."[69] Some courts view a decision to disregard substantive conclusions and evidence in reaching a contrary conclusion to be indicative of discriminatory intent.[70]

In this case, Defendant first exclaims that the 1920s was "the first and only era in which Congress openly relied" on eugenics "to enact immigration legislation."[71] Presumably this is a procedural departure. Notwithstanding the fact that the INA, again, was promulgated in the 1950s, this argument is not probative. Defendant does not cite authority stating that relying on a novel theory, however incorrect it may eventually turn out to be, is a procedural departure. Undisputedly, Congress passed both the UAA and the INA after congressional debate. Any failures to do so, circumventions of procedural rules, or otherwise, have not been asserted. That Congress allegedly only used this theory once—during its enactment of the UAA—and did not rely on it for the INA or its subsequent iterations does not buttress Defendant's claim here. In fact, it supports the contrary conclusion: the INA was enacted *absent* the eugenics and racial foundation upon which Congress may have relied in passing the UAA. Further, even though eugenics may have been unprecedented as a basis for legislation at the time, racism more generally undoubtedly played a significant role in the Nation's early twentieth century immigration laws.[72] If anything, this "departure" in the 1920s was more congruent with the contemporaneous practices of Congress in controlling immigration.

---

69. *Id.* at 267.
70. *See, e.g.*, *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 507 (9th Cir. 2016) (collecting cases); *Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 572 (N.D. Tex. 2000) (discriminatory intent where defendant "ignor[ed] the recommendations of its planners and proceed[ed] in the face of sound legal and planning advice"); *see also Arlington Heights*, 429 U.S. at 267 (relevant substantive departure where normally important factors "strongly favor a decision contrary to the one reached").
71. (Doc. 39 at 30).
72. *See United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1061 (D. Or. 2021).

Defendant also asserts that Congress adopted racial vitriol directed "almost exclusively at Mexicans" even when Canadians were "also entering the United States in record numbers,"[73] an alleged departure from "typical" substantive conclusions. But nowhere in § 1326 is there notation of a specific race, ethnic group, or nationality which may be excluded or included in its application. Some congressmen clamoring incorrectly about a "Mexican" invasion with no mention of a Canadian influx is non-probative as to the statute itself when the statute does not distinguish between the two. If Canadians had been the focus of the racism and eugenics arguments, it is not obvious that Congress would not have decided to pass the UAA or the INA as it did. Simply put, though a handful of individuals may have found the race of the migrants relevant, the law that was eventually passed did not. Thus, it cannot be said that Congress would have decided differently in voting on the UAA and INA had these alleged departures in conclusions not been made. Substantively speaking, at the time the INA was enacted, there was already a substantive provision in existence—in part from the UAA—that criminalized illegal reentry.[74] The INA merely marked its renaissance.

The undersigned detects no substantive or procedural departures. This factor therefore does not benefit Defendant.

### d.    Legislative History

Defendant again references Dr. Laughlin's testimony before Congress in the 1920s in the lead-up to the UAA's passage. For the reasons stated above, Dr. Laughlin's testimony is not wholly informative as to Congress' intent. Defendant also includes the history of the Department of Labor as part of the legislative history of § 1326; this is not legislative history, but rather historical background.[75] But again, the Department of Labor's activities concern the 1920s immigration zeitgeist, and not the 1952 INA, and so carry little value here. Beyond this, Defendant's references to

---

73. (Doc. 39 at 30–31).
74. *Machic-Xiap*, 552 F. Supp. 3d at 1076.
75. (Doc. 39 at 24–25).

then-Secretary of Labor James Davis, who was also not a member of Congress voting in favor of either bill, are likewise inconsequential.

Defendant elsewhere references congressmen who debated the merits of eugenics and the effects the theory had on immigration policy. But each of these citations are from the 1920s, some two-and-a-half decades prior to the INA's enactment. The Fifth Circuit has emphasized that in *Arlington Heights* equal protection challenges, courts cannot presume without proof that "any invidious intent" behind the enactment of a prior statute is "necessarily carried over to and fatally infected" later iterations.[76] By the time the INA had come before the 82nd Congress, there had been nearly a 96% turnover from the 1929 UAA's 70th Congress.[77] To the extent any of the 1920s pro-eugenics congressmen were in favor of the 1952 INA as well, this would be insufficient to impute intent or motive to the entire legislative body. At best, a measly 4% of Congress possessing racial animus in passing a law which requires a majority vote would hardly be representative of the approving portion.[78] A minority of errant, abhorrent speakers does not automatically or by virtue of their having spoken command the beliefs of other congressmen. Defendant generally insists that § 1326 is "infected" and provides no definitive proof that a discriminatory atmosphere persisted through the decades.[79] There is plainly no evidence before the Court that the legislative history of the INA before the 82nd Congress was tainted with 1920s racism.

Additionally, Defendant's exclamation that "Congressmen who might not have otherwise endorsed racially motivated legislation" still sanctioned racism and eugenics because they were "consistently advised"[80] of such is equally baseless and unsupported. The Court cannot void a statute

---

76. *Veasey v. Abbott*, 888 F.3d 792, 801 (5th Cir. 2018).
77. *United States v. Cac-Chon*, No. 3:20-CR-61-HEH, 2020 U.S. Dist. LEXIS 264848, at *5 (E.D. Va. Nov. 10, 2020) (citation omitted).
78. *See United States v. Ramirez-Aleman*, No. 21cr3403-BEN, 2022 WL 1271139, at *5 (S.D. Cal. Apr. 27, 2022) ("Inquiries into congressional motives or purposes are a hazardous matter . . . when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it.") (citation omitted); *see also Brnovich*, 141 S. Ct. at 2349 n.22.
79. (Doc. 39 at 20).
80. (*Id.* at 29).

"essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it."[81] Thus, whether it is a contemptible lecture by a congressman or testimony by "experts" such as Dr. Laughlin, that a given congressman hears sordid speech does not mean he adopts whatever position is discussed.[82] Defendant's remark is ostensibly extrasensory.

Even if the UAA were motivated by racial animus, therefore, the high rate of turnover between the Congresses demonstrates that a few select-but-obsolete speeches are not enough. This factor therefore does not benefit Defendant.

### e.    Disparate Impact as Indicative of Discriminatory Motive

The undersigned lastly turns to Defendant's qualms about disparate impact for *Arlington Heights*' first step. As noted below, Defendant's evidence of disparate impact is unfounded and provides no racial undertones. Even if it did so provide, to the extent Defendant avers that a disparate impact on Latinos and Mexicans supplies an inference of discriminatory motive, it is well established that disparate impact alone "is not pronounced enough to give rise to an inference of discriminatory motive" where the impact is explainable on non-racial grounds.[83] No inference of discriminatory motive is appropriate here. This factor therefore does not benefit Defendant.

None of the above factors indicate that § 1326 was enacted with discriminatory motive. Therefore, Defendant has not met his burden on the first element. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Vacate be **DENIED** for failure to demonstrate discriminatory motive under *Arlington Heights*. (Doc. 39).

---

81. *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 768 (10th Cir. 2023) (citing *United States v. O'Brien*, 391 U.S. 367, 384 (1968)).

82. If Defendant has his way, Congress, due to undisputedly abhorrent comments made nearly a century ago, would be unable to ever regulate the reentry of deported aliens at the country's southern border again. This would contravene Congress' authority to control immigration and set a precedent that all otherwise constitutional statutes with a questionable history from the Nation's dark past are immutably and incorrigibly sullied. In the absence of constitutional amendment, the undersigned declines to so set.

83. *United States v. Wence*, No. 3:20-cr-0027, 2021 WL 2463567, at *10 (D.V.I. June 16, 2021).

ii.        **Disparate Impact**

Defendant fails to meet his burden of demonstrating that § 1326 was enacted with a racially discriminatory motive. Therefore, ordinarily, the constitutional inquiry should end here. But in the interest of thoroughness, the undersigned will address whether Defendant has shown that § 1326 produces any disparate impact on individuals based on their race or alienage.

Defendant asserts that an "overwhelming number of [Customs and] Border Patrol ["CBP"] arrests along the [United States—Mexican Border] are of Mexicans or people of Latin[o] origin." Defendant cites a plethora of additional CBP arrest statistics, alleging that Mexicans and Central American migrants constitute the majority of border crossers. He concludes that these disparities mean that § 1326 "disproportionately affects Mexicans and Latin Americans."[84] The Government does not dispute that Latino and Mexican individuals are subject to prosecution under § 1326 more often than individuals of other ethnic origins. Instead, the Government homes in on the explanation that "geography, not discrimination," accounts for the ethnic proportions in prosecution.

The undersigned agrees that disparate impact has not been demonstrated. It is undeniable that Latin Americans are the most prominent subjects of § 1326 prosecution. Nevertheless, courts have found that, where a disparity is "explainable on grounds other than race," disparate impact cannot satisfy the *Arlington Heights* standard.[85] In other words, "disparate impact alone . . . is not pronounced enough to give rise to an inference of discriminatory motive," even though it is true that Latino people "are likely disproportionately affected" by § 1326.[86] Defendant admits here that Latin American people, and especially Mexicans, make up the vast majority of apprehensions by CBP and subsequent federal prosecution under § 1326. If this fact alone were sufficient, virtually any

---

84. (Doc. 39 at 34).
85. *See, e.g.*, *Wence*, 2021 WL 2463567, at *10.
86. *Id.*

immigration policy of general applicability could be challenged and invalidated on equal protection grounds.[87]

Yet Defendant fails to address the crucial fact that the United States' southern border is with Mexico, the only Latin American country to share a land border with the United States. Disparate impact must be measured by reference to the percentage of those *eligible* for prosecution under § 1326.[88] Practically speaking, it is only to be expected that most of these encounters with CBP at the border are by Latin American and Mexican individuals—i.e., people crossing the Latin American geopolitical border. This circumstance may conceivably be cause for alarm if Defendant were challenging § 1326 in, for instance, Kazakhstan. Certainly, the majority of unlawful aliens present in central Asia would be of ethnic groups other than Latino; a majority of apprehensions in Kazakhstan being of Latinos may indeed appear disparately discriminatory. But in the United States, where most of the migrants at the southern border are of Mexican or Latin American descent, these numbers are inconsequential.[89] Defendant has not demonstrated otherwise. Thus, to the same extent that an Uzbek defendant would likely experience great strife in demonstrating § 1326's improper disparate impact against Uzbeks in a Kazakh court, so too does Defendant have a heavy burden. At this stage, he has failed to meet his mark. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Vacate be **DENIED** for failure to demonstrate disparate impact under *Arlington Heights*. (Doc. 39).

### iii.        Enactment But-For Impermissible Purpose

If Defendant had surpassed the discrimination-and-disparity threshold, at the second step, the burden would shift to the Government "to demonstrate that the provision would have been enacted without an impermissible purpose."[90] The Government asserts that § 1326 would have been enacted

---

87. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 (2020).
88. *Wence*, 2021 WL 2463567, at *9.
89. *See United States v. Calvillo-Diaz*, No. 21 CR 445, 2022 WL 1607525, at *5 (N.D. Ill. May 20, 2022) (referring to the same statistics cited by the defendant as "largely meaningless" since "persons of Mexican descent" constituted a "comparable percentage of the population of persons attempting to reenter unlawfully").
90. *Harness v. Watson*, 47 F.4th 296, 304 (5th Cir. 2022).

even without any alleged racial discrimination as a motivating factor. Defendant has not responded to the Government's contentions.

The undersigned agrees with the Government. As noted above, and contrary to Defendant's claim, the proper question is not whether the 1929 UAA would have been enacted without a discriminatory purpose, but rather whether the 1952 INA would have been.[91] In support of its claim, the Government refers to the INA's multiple re-enactments and amendments since its initial iteration in 1952.

First, some history on the INA is in order. During the 1952 debates on the INA, the 82nd Congress turned down a so-called "Wetback Amendment"[92] to the INA. This amendment failed by nearly six "nays" per "yea."[93] President Harry Truman then vetoed the 1952 INA. During debate on whether to override President Truman's veto, Congressman Walter proclaimed:

> The message before us points to many good and desirable provisions of the bill. Among them it lists the removal of racial barriers to immigration and naturalization; the removal of discriminations between sexes, and other improvements of the existing law. If the President's veto is sustained, none of these improvements will be written into the law.[94]

Thus, to the extent that the 1929 UAA was created with racist overtones, the 1952 INA sought to remediate those wicked intentions. Each of the senators who voted for the "Wetback Amendment" voted against overriding the veto.[95] Eventually, the veto was overridden and the 1952 INA became law. Following its passage, Congressman Judd exclaimed that

> [t]he removal of racial bars from our immigration and naturalization laws represents for many people . . . 10 long years of hard work. When I first came [to Congress], I said that if I could help get this injustice removed, it would be worth my giving up my profession to enter political life.[96]

---

91. *See, e.g.*, *Cac-Chon*, 2020 U.S. Dist. LEXIS 264848, at *4.
92. 98 Cong. Rec. 8116 (June 26, 1952) ("Unless the Government takes drastic measures to stop the wetback invasion, the gates will be opened for every kind of influence that could possibly be dreamed of to permit illegal entry into the United States.").
93. 98 Cong. Rec. 8123 (June 26, 1952).
94. 98 Cong. Rec. 8215 (June 26, 1952).
95. *United States v. Hernandez-Lopez*, 583 F. Supp. 3d 815, 820 (S.D. Tex. 2022).
96. 98 Cong. Rec. 8347 (June 27, 1952).

Since 1952, Congress amended § 1326 five times in order to increase its penalties.[97] In anticipation of the most recent amendments in 1990, Congressman Fish of the 101st Congress "emphasized that the changes the legislation brought about would 'not disturb the basic reasons for which we have always, and will always, exclude aliens: For cases where aliens have criminal records, when they are public health risks, when they violate drug laws, when they are likely to become economic burdens on the country, or *when they have previously violated U.S. Immigration laws.*'"[98] While the law of course is still not without its flaws, it is clear that the 1952 INA and its subsequent amendments have "removed some of the racial distinctions of prior immigration law."[99]

Like the vast majority of courts addressing the issue, the undersigned believes that the INA would have been passed absent any racial animus. As troubling as the 1929 UAA was, the 1952 INA was enacted to resolve many of the former act's racial and ethnic qualifications. The abundance of congressional proclamations and speeches illustrate an intent not to continue along a trajectory of discrimination or racism, but to eradicate any vestigial racial disparities § 1326 or its origin provisions may have possessed.[100] Thus, not only was the 1952 INA seemingly passed without discriminatory intent, but it was enacted with an *anti-racist* purpose. Unless Defendant is, curiously, asserting that departing from the immigration statute's supposed racist heritage is an impermissible purpose, the undersigned can only conclude that the 1952 INA would have been enacted but for racist sentiment. Defendant has not cited any authority demonstrating that the 82nd, 101st, or any other post-70th Congress possessed the requisite discriminatory purpose. All button-copy signs along § 1326's highway of amendments reflect the light of remediation. The Government has therefore met its burden.

---

97. *Hernandez-Lopez*, 583 F. Supp. 3d at 819.
98. *Wence*, 2021 WL 2463567, at *8 (quoting 136 Cong. Rec. 36844 (Oct. 27, 1990)) (emphasis in original).
99. *United States v. Romo-Martinez*, No. SA-21-CR-00263-OLG, 2022 WL 16825190, at *6 (W.D. Tex. Nov. 8, 2022).
100. *See Wence*, 2021 WL 2463567, at *8 ("These proclamations indicate thoughtful, non-racially motivated public policy considerations for the passed legislation . . . .").

The Government has demonstrated that 1952's INA would have been enacted but for any impermissible racist or ethnic purposes. Even if Defendant met his burden of showing Congress had a discriminatory motive in creating § 1326, his equal protection claim still fails. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Vacate be **DENIED**. (Doc. 39).

## D.   Certificate of Appealability

Defendant has not yet moved for a certificate of appealability from this Court, but the Court can nevertheless consider whether this case's merits warrant granting one at this stage.[101] An appeal to the Fifth Circuit may not be taken from a final order in a habeas corpus proceeding unless the Fifth Circuit itself issues a certificate of appealability.[102] Rule 11 of the Federal Rules Governing Section 2255 cases mandates that, upon entering a final order adverse to the applicant, the district court "issue or deny a certificate of appealability."[103] In order to obtain a certificate of appealability, the petitioner must make a "substantial showing of the denial of a constitutional right."[104] This determination requires an "overview of the claims in the habeas petition and a general assessment of their merits."[105] "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[106]

The undersigned concludes above that neither of Defendant's two grounds are meritorious. It follows that reasonable jurists would not conclude otherwise.[107] Accordingly, the undersigned **RECOMMENDS** that a certificate of appealability for Defendant be **DENIED**.

---

101. *See Perez v. Cockrell*, 77 F. App'x 201, 203 (5th Cir. 2003) (internal citations omitted).
102. 28 U.S.C. § 2253(c)(1)(A).
103. *Morrison v. United States*, No. MO: 10-CR-00135(1)-RAJ-DC, 2015 WL 12645590, at *24 (W.D. Tex. Apr. 2, 2015) (citing Rule 11, RULES GOVERNING SECTION 2255 PROCEEDINGS).
104. 28 U.S.C. § 2253(c)(2).
105. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).
106. *United States v. Fields*, 761 F.3d 443, 452 (5th Cir. 2014) (internal citation omitted).
107. *See Villegas v. United States*, Nos. M-16-213, -- F. Supp. 3d -- , 2019 WL 1930026, at *5–6 (S.D. Tex. Apr. 3, 2019), *report and recommendation adopted*, Nos. M-16-213, M-06-1089-3, 2019 WL 1930290 (S.D. Tex. Apr. 30, 2019).

### IV. RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's Motion to Vacate be **DENIED**. (Doc. 39).

SIGNED this 17th day of May, 2023.

DAVID B. FANNIN
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND RIGHT TO APPEAL/OBJECT**

In the event that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested. Pursuant to 28 U.S.C. § 636(b), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Judge. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made; the District Judge need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the U.S. Magistrate Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the District Judge. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).